UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MCI NETWORK SERVICES, INC., n/k/a VERIZON BUSINESS NETWORK SERVICES, INC., <br><br> Plaintiff, <br><br> v. <br><br> GLOBCOM, INC., an Illinois corporation, and GLENN KOFMAN, an individual. <br><br> Defendants. | Case No. 05 C 5759 <br> Judge Joan B. Gottschall |

## MEMORANDUM OPINION AND ORDER

Plaintiff MCI Network Service, Inc., n/k/a Verizon Business Network Services, Inc. ("Verizon"), filed this suit against defendants Globcom, Inc. ("Globcom") and Glenn Kofman ("Kofman") on October 6, 2005, alleging that defendants breached various agreements by failing to pay for telecommunications and digital services provided by Verizon.[1] Although the underlying agreements were between Verizon and Globcom, Verizon joined Kofman as a party based on the theory that Globcom's corporate veil should be pierced and Kofman held responsible for Globcom's debts and obligations. On December 15, 2005, the court entered judgment against Globcom for $2,997,569.92 plus post-judgment interest of nine percent and any attorneys' fees and costs Verizon might incur in enforcing the judgment. Unable to collect from Globcom, which had ceased operations without notice to Verizon shortly before this lawsuit was filed, Verizon proceeded against Kofman.

---

[1] Jurisdiction is based on diversity of citizenship pursuant to 28 U.S.C. § 1332 (2006)—Verizon is a Delaware corporation with its principal place of business in Virginia; Globcom is an Illinois corporation with its principal place of business in Illinois; and Kofman is an Illinois citizen.

1

Currently before the court is Verizon's motion for summary judgment, which seeks a ruling that Kofman is personally liable for the judgment Verizon obtained against Globcom. Although Kofman had numerous opportunities to file a response to Verizon's motion—Kofman's response is now more than four months overdue, and the court gave him a generous extension and sent him copies of the relevant federal and local rules as well as a cautionary instruction pursuant to Northern District of Illinois Local Rule 56.2—he failed to do so. As a result of Kofman's failure to file a Local Rule 56.1(b)(3) response to Verizon's statement of material facts, the court accepts as true all of the material facts set forth in Verizon's Local Rule 56.1(a)(3) statement. *See Raymond v. Ameritech Corp.*, 442 F.3d 600, 608 (7th Cir. 2006); *Dimmitt & Owens Fin., Inc. v. Superior Sports Prods., Inc.*, 196 F. Supp. 2d 731, 736-37 (N.D. Ill. 2002). The question before the court is whether those facts, viewed in the light most favorable to Kofman, entitle Verizon to judgment as a matter of law against Kofman. *See Raymond*, 442 F.3d at 608; Fed. R. Civ. P. 56(c).

## I. ANALYSIS

Verizon's motion is premised on the argument that Kofman should be held liable for Globcom's debts because Globcom is really a sham corporation that Kofman used for his own benefit. In general, "[a] corporation is a legal entity that exists separately and distinctly from its shareholders, officers, and directors," *Fontana v. TLD Builders, Inc.*, 840 N.E.2d 767, 775 (Ill. App. Ct. 2005), and parties related to a corporation are normally not subject to corporate liabilities. *See Dimmitt*, 196 F. Supp. 2d at 738. However, an exception to this rule exists when an "individual or entity uses a corporation merely as an instrumentality to conduct that person's or entity's business." *Fontana*, 840 N.E.2d at 775-76. In such situations, the corporate veil of limited liability may be "pierced" and the individual held liable for the underlying cause of

action. *Sea-Land Servs., Inc. v. Pepper Source*, 941 F.2d 519, 520 (7th Cir. 1991) (quoting *Van Dorn Co. v. Future Chem. & Oil Corp.*, 753 F.2d 565, 569-70 (7th Cir. 1985)). "[P]iercing the corporate veil" is an equitable remedy designed to prevent those who fail to respect a corporation's separate legal existence from hiding behind the corporation to avoid liability for their wrongdoing. *Fontana*, 840 N.E.2d at 776; *see also Dimmitt*, 196 F. Supp. 2d at 738 (same); *Conopco, Inc. v. S.K. Foods*, No. 98 C. 1882, 1999 WL 965554, at * 3 (N.D. Ill. Sept. 30, 1999) (same). A party seeking to pierce the corporate veil must demonstrate that (1) there is "such unity of interest and ownership" between the individual and the corporation "that the separate personalities of the corporation and the individual . . . no longer exist;" and (2) the circumstances are "such that adherence to the fiction of separate corporate existence would sanction a fraud or promote injustice." *Hystro Prods., Inc. v. MNP Corp.*, 18 F.3d 1384, 1388-89 (7th Cir. 1994). The court will examine each of these questions in turn.

### A. Globcom and Kofman Do Not Have Separate Identities

To determine whether the "unity of interest and ownership" between an individual and a corporation is such that the corporate fiction should be disregarded, courts consider the following factors: "(1) inadequate capitalization; (2) failure to issue stock; (3) failure to observe corporate formalities; (4) nonpayment of dividends; (5) insolvency of the debtor corporation; (6) non-functioning of the other officers or directors; (7) absence of corporate records; (8) commingling of funds; (9) diversion of assets from the corporation by or to a shareholder; (10) failure to maintain arm's length relationships among related entities; and (11) whether the corporation is a mere façade for the operation of the dominant shareholders." *Dimmitt*, 196 F. Supp. 2d at 738; *see also Fontana*, 840 N.E.2d at 778 (same); *accord Hystro*, 18 F.3d at 1389 (discussing factors used by Illinois courts to decide whether separate identities of corporation and individual should

be disregarded). The court's task is to decide whether these factors, taken as a whole, demonstrate that the corporation is actually the alter ego of the individual—no one factor is determinative. *See Dimmitt*, 196 F. Supp. 2d at 738. As the following summary of facts taken from Verizon's Local Rule 56.1(a)(3) statement indicates, nearly every one of these factors is overwhelmingly met in this case.

Kofman formed Globcom in 1995, and at all relevant times he owned seventy-five percent of Globcom's stock; the other twenty-five percent was owned by his mother. Kofman was Globcom's President, Secretary, and Treasurer, and was Globcom's sole functioning officer, director, and shareholder. Although Kofman's mother was also an officer and director, her role within Globcom was virtually nonexistent. In fact, Kofman's mother does not recall ever taking any action in her capacity as director or officer of Globcom. She never attended a meeting of the board of directors or shareholders,[2] never voted or gave input on any actions taken by Globcom, and never reviewed Globcom's financial statements. Rather, her role with Globcom was strictly limited to working on accounts receivable and accounts payable, and she testified at her deposition that she "simply did what she was told to do by Kofman." Pl.'s Rule 56.1 Statement of Undisputed Material Facts ¶ 59. Nor did Kofman's mother receive distributions from Globcom equal to her ownership percentage; Globcom's available financial statements indicate that while Kofman's mother owned twenty-five percent of Globcom's shares, the distributions she received amounted to only two percent of the distributions received by Kofman.

The record indicates that Kofman made virtually every business decision for Globcom. Kofman determined Globcom's operational needs, what contracts and business relationships Globcom entered into, Globcom's dividend policies, whether Globcom would issue stock, and

---

[2] In fact, there is no evidence in the record that Globcom's board of directors or its shareholders ever held any meetings at all.

whether Globcom would observe corporate formalities (it did not).[3] Kofman managed Globcom's assets exclusively, and he maintained control over Globcom's financial books and records. For all intents and purposes, Kofman *was* Globcom, for all of the actions taken by Globcom, particularly those relevant to this lawsuit, were directed by Kofman.

The relationship between Verizon and Globcom began in 1999, when Kofman, acting through Globcom, entered into an agreement with Verizon whereby Verizon was to provide certain telecommunications and digital services to Globcom; the parties' relationship was modified by a second agreement in 2003. To secure Globcom's payment for Verizon's services, the parties also entered a security agreement, the effect of which was to grant Verizon a security interest in Globcom's property. The parties did business under the agreements until July of 2005, when Verizon notified Globcom that it was in default of the agreements and demanded payment for services rendered. When Globcom did not respond to Verizon's demand, Verizon brought the instant suit. Through discovery, Verizon learned that Globcom could not meet its financial obligations to Verizon because Kofman had spent 2003 and 2004 using Globcom's assets to finance the construction of a nightclub in Miami, Florida, and to pay for assorted personal expenses.

In addition to his control over Globcom, Kofman is heavily involved with two other corporations relevant to this case: Kore Entertainment, Inc. ("Kore") and Nocturnal Miami, Inc.

---

[3] In addition to its failure to conduct meetings or hold votes, Globcom did not maintain a registered agent and did not regularly submit annual reports to the Illinois Secretary of State or comply with corporate reporting requirements. In this litigation, Globcom also failed to produce tax returns for the years 1995 through 1998 and financial statements, bank records, general ledgers, check registers, and credit card statements for the years 1995 through 2001 and 2005. Although it is possible that these records exist but were not produced because of Globcom's discovery failures, the court presumes that their absence is due to Globcom's failure to generate them in the first place. *See, e.g.*, *Dimmitt & Owens Fin., Inc. v. Superior Sports Prods., Inc.*, 196 F. Supp. 2d 731, 738 (N.D. Ill. 2002) ("An unfavorable evidentiary presumption arises if a party, without reasonable excuse, fails to produce evidence which is under his control.").

("Nocturnal Miami").[4] Kore owns a parcel of land in downtown Miami, and Nocturnal Miami owns a 20,000 square foot state-of-the-art nightclub by the same name that is built on that land. Kofman's control over Kore and Nocturnal Miami appears to be similar to his control over Globcom; Kofman serves as President, Secretary, and Treasurer of both entities, he is their sole director, and he owns one-hundred percent of Nocturnal Miami's stock.[5] During the relevant time period, Nocturnal Miami maintained the same business address and phone number as Globcom. The construction of the Nocturnal Miami nightclub began in 2003, and the record indicates that it was built entirely with Globcom's money. In fact, Kofman directed (against the advice of his accountants) that checks totalling more than $3.7 million be written from Globcom's accounts to finance Nocturnal Miami in 2003 and 2004. The payments were not secured by a promissory note or subject to interest. Instead, Kofman retained a receivable note—in his name—for these funds. His use of Globcom's funds to finance Nocturnal Miami did not stop there; Globcom also paid for the tax and accounting services of both Kore and Nocturnal Miami, as well as the property taxes for the land on which Nocturnal Miami was built.

In addition to the money Kofman drained from Globcom to finance Kore and Nocturnal Miami, he also used Globcom's funds to pay for a vast array of personal expenses. For example, Kofman purchased a condominium in Chicago for more than $3 million and made his mortgage and condominium association payments from Globcom's accounts. He also used Globcom money to pay his property taxes on the condominium as well as on his residence in Northbrook, Illinois. Moreover, Globcom paid over $200,000 for the 2004 tax returns of Kofman and his former wife. Finally, Kofman regularly withdrew spending money from Globcom's accounts via

---

[4] According to the record, neither Kore nor Nocturnal Miami is a subsidiary of Globcom, although it is apparent that Globcom heavily financed both corporations.
[5] The record does not indicate what percentage of Kore's stock is owned by Kofman. Verizon tendered requests for admission to Kofman stating that Kofman owns ninety-five percent of Kore's stock and his mother owns the other five percent, but Kofman refused to admit these facts.

automated teller machines and used Globcom funds to pay his personal credit card bills. All told, Kofman used more than $1 million of Globcom's money to pay for personal expenses during 2003 and 2004 combined.

Globcom ceased doing business in early fall of 2005, shortly after it received notice of its defaults under the agreements with Verizon. Again, the decision to stop doing business was made exclusively by Kofman. Globcom did not provide notice to any of its creditors, including Verizon, that it was shutting down. Rather, it simply shut off its telephone and facsimile lines. Verizon sent Globcom a letter demanding that it be allowed to inspect Globcom's books and records, as it was entitled to do under its agreements with Globcom, but when Verizon's agent arrived at Globcom's office on the designated day he was unable to gain access and neither Kofman nor any other representative of Globcom showed up. Verizon has subsequently learned through discovery that Globcom was dramatically undercapitalized and that it could not pay its debts to Verizon when Verizon demanded payment due to the amount of funds drained by Kofman.

As the facts recited above indicate, there is little doubt that there is sufficient unity of interest and ownership between Globcom and Kofman to allow Globcom's corporate veil to be pierced. Kofman dominated every aspect of Globcom, failed to respect any corporate formalities, and treated Globcom as his personal bank account even though Globcom held obligations to creditors such as Verizon. Indeed, the facts in this case are much more egregious than those that have been held sufficient to justify piercing the corporate veil in analogous cases. *See, e.g.*, *Sea-Land*, 941 F.2d at 521-22 (finding unity of interest and ownership where individual used corporate bank account to pay personal expenses, few corporate formalities were observed, and corporations did not have sufficient capital to meet obligations to plaintiff, noting that the

corporations were "little but [defendant's] playthings"); *Dimmitt*, 196 F. Supp. 2d at 738-39 (individual who made virtually all corporate decisions, failed to observe corporate formalities or maintain adequate records, and used corporate funds for personal expenses held liable for corporate debts on summary judgment motion); *Fontana*, 840 N.E.2d at 779-81 (veil pierced against individual who dominated corporation and commingled corporate and personal funds). Accordingly, the court finds that the first part of the veil-piercing standard has been met in this case.

### B. Allowing Kofman to Escape Liability Would Be Inequitable

In addition to demonstrating that an individual and a corporation should be treated as a single entity, a party seeking to pierce the corporate veil must also show that fraud or injustice will result if the court fails to do so. *See Hystro*, 18 F.3d at 1390. To satisfy this portion of the inquiry, the moving party must point to more than the mere prospect of an unsatisfied judgment. *See Sea-Land*, 941 F.2d at 522. Rather, the moving party must show that "some 'wrong' beyond a creditor's inability to collect [will] result" if the corporation's veil is not pierced, such as the individual being unjustly enriched or unfairly avoiding liability after draining corporate assets. *Id.* at 524; *see also Hystro*, 18 F.3d at 1390 (same). Importantly, the Seventh Circuit has given the following as an example of inequitable conduct that justifies veil piercing: "a corporate owner who used his several corporations to avoid responsibilities to creditors." *Hystro*, 18 F.3d at 1390 (citing *Sea-Land Servs., Inc. v. Pepper Source*, 993 F.2d 1309, 1312 (7th Cir. 1993)).

In the instant case, there is no doubt that it would inequitable to allow Kofman to escape responsibility for Globcom's debts to Verizon. As the foregoing summary of facts demonstrates, Kofman used Globcom's assets to finance his extravagant lifestyle and the construction of his nightclub in Miami, leaving Globcom an insolvent shell incapable of meeting its financial

8

obligations to Verizon. Indeed, to merely say that Kofman pilfered money from Globcom would be a dramatic understatement—the materials provided by Verizon in support of its summary judgment motion demonstrate that the sum Kofman improperly withdrew from Globcom immediately before he shut down its operations would more than satisfy Globcom's substantial obligation to Verizon. If Globcom's corporate veil is not pierced, Kofman will be unjustly enriched because he will be rewarded for using money to which Verizon was legally entitled to establish what is presumably a lucrative entertainment business in Miami. While Verizon will not receive the benefit of its bargain with Globcom, Kofman will continue to prosper through his wrong-doing. Such an inequitable result is exactly what the doctrine of piercing the corporate veil is designed to prevent. *See, e.g.*, *Hystro*, 18 F.3d at 1391 ("The attempt to do corporate business without providing any sufficient basis of financial responsibility to creditors is an abuse of the separate entity and will be ineffectual to exempt the shareholders from corporate debts." (citation omitted)). Therefore, the court holds that Globcom's corporate veil should be pierced and Kofman held liable for the judgment rendered against Globcom in this case.

## II. CONCLUSION

For the foregoing reasons, Verizon's motion for summary judgment against Kofman is granted.

SIGNED:

/s/
Joan B. Gottschall
United States District Judge

Dated: June 27, 2007